**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| OASIS TOOLING, INC., a Delaware Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 22-151-VAC |
| SIEMENS INDUSTRY SOFTWARE, INC., a Delaware Corporation, | ) ) ) | |
| Defendant. | ) ) | |

**PLAINTIFF OASIS TOOLING, INC.'S OPPOSITION TO
DEFENDANT SIEMENS INDUSTRY SOFTWARE INC.'S
MOTION TO DISMISS THE COMPLAINT UNDER FED. R. CIV. P. 12(b)(6)**

OF COUNSEL:

Paul J. Andre
Lisa Kobialka
James Hannah
KRAMER LEVIN NAFTALIS
& FRANKEL LLP
990 Marsh Road
Menlo Park, CA 94025
(650) 752-1700

Aaron M. Frankel
Cristina Martinez
KRAMER LEVIN NAFTALIS
& FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

Dated: April 18, 2022

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE  19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Plaintiff
Oasis, Inc.*

**TABLE OF CONTENTS**

I.    NATURE AND STAGE OF THE PROCEEDINGS ........................................................... 1

II.   SUMMARY OF THE ARGUMENT ................................................................................ 1

III.  STATEMENT OF FACTS ................................................................................................ 1

      A.    Conventional Technology Had a Problem Validating and Analyzing Chip
            Designs................................................................................................................... 2

      B.    The Asserted Patents Claim Inventions that Solve the Chip Design
            Verification and Analysis Problems ...................................................................... 6

      C.    The Specific Solutions of the Asserted Claims Provide Important Benefits .......... 8

IV.   ARGUMENT ................................................................................................................... 8

      A.    The Asserted Claims Are Not Abstract Under Alice Step One ............................... 9

            1.    The Asserted Claims Provide a Specific Solution ...................................... 9

            2.    The Asserted Claims Solve a Problem Specifically Arising in the
                  Computer Realm to Improve the Functionality of Chip-Design
                  Computers ................................................................................................ 13

      B.    The Asserted Claims Contain Inventive Concepts Under *Alice* Step Two........... 14

            1.    The Asserted Claims Are Based on Inventive Concepts .......................... 15

            2.    The Asserted Claims Provide Tangible Benefits ..................................... 16

            3.    The Asserted Claims Recite Concrete Limitations and Do Not
                  Preempt the Field .................................................................................... 16

      C.    *Berkheimer* Confirms That Siemens' Motion Should Be Denied Because it
            is Based on Factual Disputes That Cannot Be Resolved on the Pleadings........... 18

V.    CONCLUSION ............................................................................................................. 20

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shade Software, Inc.*,
  882 F.3d 1121 (Fed. Cir. 2018)................................................................19

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  890 F.3d 1354 (Fed. Cir. 2018)................................................................18

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014).................................................................... *passim*

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
  841 F.3d 1288 (Fed. Cir. 2016)................................................................16

*Art+COM Innovationpool GmbH, v. Google Inc.*,
  183 F.Supp.3d 552 (D. Del. 2016)............................................................17

*Bascom Global Internet Servs., Inc., v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016)....................................................15, 19, 20

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................................9

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018)....................................................18, 19, 20

*In re BRCA1- & BRCA2-Based Hereditary Cancer Test Pat. Litig.*,
  774 F.3d 755 (Fed. Cir. 2014)..................................................................12

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
  927 F.3d 1306 (Fed. Cir. 2019)................................................................19

*CLS Bank Int'l v. Alice Corp. Pty. Ltd.*,
  717 F.3d 1269 (Fed. Cir. 2013)..................................................................9

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
  880 F.3d 1356 (Fed. Cir. 2018)............................................................9, 11

*CosmoKey Sols. GmbH v. Duo Sec. LLC*,
  15 F.4th 1091 (Fed. Cir. 2021)................................................................14

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  773 F.3d 1245 (Fed. Cir. 2014)....................................................12, 13, 15, 18

*Elec. Power Grp., LLC, v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016)................................................................12

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016)........................................................ *passim*

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    879 F.3d 1299 (Fed. Cir. 2018)..........................................................11, 14

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
    942 F.3d 1143 (Fed. Cir. 2019)..........................................................11, 14

*McRo, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016)..........................................................13, 16

*Network Congestion Sols., LLC v. U.S. Cellular Corp.*,
    170 F. Supp. 3d 695 (D. Del. 2016).....................................................11, 12

*Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*,
    827 F.3d 1042 (Fed. Cir. 2016)................................................................15

*Smartflash LLC v. Apple Inc.*,
    No. 6:13cv447, 2015 WL 661174 (E.D. Tex. Feb. 13, 2015) .................17

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
    179 F.Supp.3d 339 (D. Del. 2016),
    *aff'd in relevant part*, 930 F.3d 1295 (Fed. Cir. 2019) ...........................11

*StoneEagle Servs., Inc. v. Pay-Plus Sols., Inc.*,
    113 F.Supp.3d 1241 (M.D. Fla. 2015)...................................................18

*Synopsys, Inc. v. Mentor Graphics Corp.*,
    839 F.3d 1138 (Fed. Cir. 2016)................................................................14

*Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*,
    916 F.3d 1363 (Fed. Cir. 2019)................................................................12

## Statutes

35 U.S.C. § 282(a) ........................................................................................9

## Other Authorities

Fed. R. Civ. P. 12(b)(6)........................................................................ *passim*

## I.      NATURE AND STAGE OF THE PROCEEDINGS

Oasis Tooling, Inc. ("Oasis") filed a complaint for infringement of U.S. Patent Nos. 7,685,545 ("'545 Patent") and 8,266,571("'571 Patent") (collectively the "Asserted Patents") against Siemens Industry Software, Inc. ("Siemens") on February 1, 2022.  Siemens then filed this Motion to Dismiss under Federal Rule of Civil Procedure § 12(b)(6).  D.I. 14 ("Motion").

## II.     SUMMARY OF THE ARGUMENT

The claims of the Asserted Patents (the "Asserted Claims") are patent eligible because they identify a significant problem in the complex integrated circuits ("chip") manufacturing industry, are directed to specific implementations of a specific technological solution to that problem, are based on inventive concepts, and provide important tangible benefits.

The inventions of the Asserted Patents represented a seismic shift in the process for developing and manufacturing chips, significantly accelerating, reducing the costs, and improving the reliability of the then-conventional methods.  Designing chips is a very labor intensive and expensive process.  Chip designs are intricate and complex, can be created with a variety of design tools, and can be written in many different chip-design languages.  Before the inventions of the Asserted Patents, it was difficult to reliably and accurately validate and analyze chip designs.  The Asserted Patents solved this problem with a series of inventive processes that, for the first time, made it possible to effectively validate and analyze relevant changes to chip designs regardless of the design tool or language used to create the design.  As a result, the Asserted Claims are not abstract, and Siemens' Motion should be denied.  At a minimum, the Motion is premised on factual disputes that preclude dismissal at the pleadings stage.

## III.    STATEMENT OF FACTS

Thomas Grebinski, one of the named inventors of the Asserted Patents and the founder of Oasis, is a semiconductor pioneer.  D.I. 1 at ¶¶ 3, 13-14.  Prior to forming Oasis in 2004, Mr.

Grebinski led the industry working group that developed the Open Artwork System Interchange Standard ("OASIS®") chip-design language, which is a language used by computers to represent chip designs during chip design and manufacturing processes.  *Id.* at ¶ 9.  Oasis develops software for the chip design and manufacturing industries, including software relating to OASIS®.  *Id.* at ¶ 10.

Today, Siemens' flagship computer-chip design tool, Calibre, is used throughout the chip design and manufacturing process.  Calibre relies heavily on the patented technology of Oasis' Asserted Patents.  D.I. 1 at ¶¶ 33-89.  Siemens copied Oasis' technology and is willfully infringing Oasis' Asserted Patents.  D.I. 1 at ¶¶ 23-32, 47.

## A.     Conventional Technology Had a Problem Validating and Analyzing Chip Designs

Virtually every aspect of today's global economy depends on chips, which come in countless different specific designs to provide a wide range of functions and meet varying design criteria.  Due to the complexity of chip designs and the numerous parties involved in the design and manufacturing process, the industry had a significant challenge in confirming that the chips were manufactured using the chip designer's approved final design.

By way of background, chip designs are a blueprint for a chip to be manufactured, and these designs are broken into hundreds of thousands of pieces called "cells."  '545 Patent at 1:39-44.[1]  These chip designs are created using design software and can be written in many different chip-design languages (such as OASIS®) that express the functional and physical properties for every cell.  Even within a single chip-design language, the same cell can be described in a wide variety of functional and geometric ways.  '545 Patent at 4:11-15; 4:41-44, 6:65-7:16.

---

[1] Citations in this brief are to the specification of the '545 Patent.  The same passages appear in the '571 Patent specification.





D.I. 1-2, Ex. 16 at 1 (chip made of hundreds of thousands of cells)

D.I. 1-2, Ex. 26 at 4 (example of a single cell in a chip design)

Chip design and manufacturing is a complicated and expensive process. Typically, a single chip with its specific design involves collaboration between multiple companies and hundreds or thousands of skilled engineers, often at multiple locations around the world, utilizing different software programs for the various stages of the design and manufacturing processes. D.I. 1 at ¶ 35. Participants in the different stages of designing and manufacturing chips are called "nodes" and include, for example, (1) companies who design, but do not manufacture, chips, (2) suppliers of intellectual property who license or sell chip components that can be integrated into a full chip design, (3) manufacturers who both design and manufacture chips or devices using chips, and (4) foundries who actually manufacture semiconductor chips and devices, often on behalf of customers providing the chip designs. D.I. 1 at ¶¶ 35-36. Participants at the different nodes, and even at the same node, can use different software tools, store chip-design information in different formats and languages, and can store multiple versions of chip designs. D.I. 1 at ¶ 35.

At various stages in the chip design and manufacturing process, it is necessary for

participants to exchange chip designs.  For example, a company designing a chip may obtain designs to use in parts of the chip from an intellectual property supplier.  D.I. 1 at ¶ 36; D.I. 1-1, Exs. 7-8.  Engineers may work on different parts of the chip at the same time, which makes it necessary to ensure that they are all working with the same current version of the chip design. *Id.*  Further, the designer and foundry will exchange the chip designs as they are developed, for running test manufacturing runs, and as the chip is refined and debugged, until the design is finalized and sent for mass production.  *Id.*

Participants in the chip-design process need to confirm that they are using are the correct chip-design version because chip design is an iterative process involving many revisions before the design is finalized.  '545 Patent at 1:45-53.  The cells in a chip design and groups of cells (referred to as "blocks") proceed through the design process at different rates and are usually worked on by different teams of engineers, making it difficult to keep track of the most recent version of cells and blocks in the chip design.  *Id.*

At the end of a development effort, chip designers need to be able to verify that the design the foundry will use for manufacturing is the same as the chip designer's approved design and includes the final, approved, version of all of the cells in a design and, if different, whether the changes are significant.  *Id.* at 4:25-31.  When production starts, it is critical to use the correct, final, approved, version of all of the cells in the chip design.  "Using the wrong version of a [chip] can cost millions of dollars and months of delay."  *Id.* at 3:66-4:4.

The chip-design verification process is very challenging because participants in the process can use different chip-design software, languages, or ways of describing the same cells. Conventional tools failed to correctly identify when two cells were functionally the same but expressed differently or in different languages.  *Id.* at 2:22-34, 4:22-31.  This difficulty is

compounded by the complexity of chip designs, which can include 40,000 or more unique cells within hundreds of thousands or millions of individual cells. *Id.* at 2:12-21. Conventional tools therefore could not "verify[] that the cells in [a chip] design are of the latest approved version, in ensuring that the cells have not been improperly copied or imported." *Id.* at 4:22-31.

Participants in the chip development process also need a tool to identify when portions of different chip designs include the same cells. '545 Patent at 4:8-10. For example, if "someone discovers a yield problem in a product that uses a particular design," they need to be able to analyze their other designs to "determin[e] what other projects use that design." *Id.* at 1:49-53. Such operations are also important to determine if a chip design uses intellectual property for which royalty payments need to be made, for example, by identifying the portions of a chip design that match libraries of licensable portions of designs. *Id.* at 69:10-15. As with verification, the massive number of cells and variety of ways the same cell can be described in a chip design make it very challenging, if not impossible, to accurately perform these complex analyses. *Id.* at 2:12-21. Conventional chip-design tools could not "effectively determine or summarize what has [meaningfully] changed within a given collection of cell[s]." *Id.* at 4:8-10.

Another important analysis in the chip-design process is the design rule checking ("DRC") waiver process. "DRC is the application of a set of geometric rules by a chip fabricator to ensure that a chip design will have a reasonably high yield." D.I. 1 at ¶ 40. In essence, these are rules to ensure that the mass-manufactured chip will have as few defective chips as possible. *Id.* ("DRC often involves checking that cells comply with minimum separation rules so that normal manufacturing variation will not result in an excessive number of defective chips."). Different foundries, and even different plants owned by a foundry, can use different equipment for manufacturing chips, which can impose additional and different constraints on chip designs

based on the equipment used at that foundry.  D.I. 1 at ¶ 38; D.I. 1-1, Ex. 10 at 2.  For this

reason, "[e]ach [foundry] can have its own design rules based on its specific equipment and

manufacturing processes."  *Id.* at ¶ 40.

Foundries maintain libraries of cell designs that are acceptable even though they fail

DRC, because these "waived" cell designs are known to still give an acceptable yield.  *Id.* at ¶¶

40-41.  Identifying these waived-cell designs is critical to make chip designs as compact as

possible, which is an important design goal for chips.  However, prior to the Asserted Patents, it

was an extremely ineffective, time consuming, and expensive manual process to accurately

identify cells in a chip design that failed DRC but corresponded to cell designs in the database of

waived designs.  *Id.*  As modern chip designs became more complicated and compact, resulting

in more DRC violations, identifying waived designs became more and more important, while

effectively doing so manually became effectively impossible.

For these reasons, prior to the Asserted Patents, these operations and many others in the

chip design and manufacturing process, were ineffective, time consuming, and expensive.

**B.     The Asserted Patents Claim Inventions that Solve the Chip Design
         Verification and Analysis Problems**

The Asserted Claims provide specific implementations of solutions to the above-

described problems in verifying and analyzing chip designs, and permitted automation of the

process in a way that was previously impossible.  The Asserted Claims, therefore, solve long-

standing problems arising in chip design such as: (1) "understanding an updated cell design

library" that is "received from foundries," (2) determining "whether to adopt an updated cell

design library during development," (3) "finding unapproved and/or bad cells in design data," (4)

"identifying renamed cells in design data," (5) "detecting cell modifications that jeopardize

warranties," (6) conducting "royalty audits," and (7) providing an "immediate response to failure

6

analysis." '545 Patent at 68:57-71:50.

The inventions of the Asserted Claims allow for the granular analysis of chips and identification of similarities and differences between chip designs at every step of the development and manufacturing process. D.I. 1 at ¶¶ 18-22. The Asserted Claims cover a range of specific solutions and go far beyond simply "comparing data," as Siemens suggests. These claimed solutions are based on a novel and non-conventional combination of specific components, including a parser, normalizer logic, partitioning module, syntax tree, canonical forming modules, digester, and reporter, amongst others, discussed below. *Id.* at ¶ 15. Especially as an ordered whole, these steps were not known, let alone conventional, in the art at the time of the inventions. *Id.* at ¶¶ 19-20; '545 Patent at 2:22-67.

For example, according to various Asserted Claims, chip designs are parsed into "syntax trees," a specific data structure, and then partitioned into significant and non-significant "canonical forms." *See, e.g.*, '545 Patent at Claim 14 ("a parser running on the processor, that parses a file containing design data representing aspects of a design for a physical circuit and creates one or more syntax trees in the memory"); *id.*, Claim 1 ("partitioning functionally significant design data from non-significant data within the canonical forms, wherein the design data is functionally significant when a change in the design data would result in a change in a circuit generated from the design data"). Canonical form generally refers to an identification of the functional aspects of a cell, so that cells with non-functional variations will be recognized as the same. *Id.* at 69:23-26.

The canonical cell forms are then used to generate "digests" by applying a variety of specific techniques, such as "CRC, MD5 and other[]" hash functions. '545 Patent at 6:6-9. The digests are then used to quickly identify if cells are the same or different and their significance,

even if the cells were originally expressed differently or in a different language or format.  *Id.* at 6:16-26.  For example, the digests can identify meaningful changes between chip designs.  '571 Patent at Claim 20 ("the reporter module summarizes the functionally significant changes in the new library that are detected by comparing the digests").  The digests then generate reports identifying commonality in chip designs expressed in different languages or variations, which was not possible using conventional technology.  '545 Patent at 6:27-60.

###### C.    The Specific Solutions of the Asserted Claims Provide Important Benefits

The inventions of the Asserted Claims cover specific solutions that provide important benefits.  With the Asserted Claims, it was possible for the first time to ***automatically*** validate chip designs and identify and analyze changes, and to do so efficiently and reliably even if they were expressed in different languages, created using different tools, or written in the same language but described using different functional or geometric expressions.  D.I. 1 at ¶ 18. "[T]he inventions of the Asserted Patents[, thus,] allow for a new kind of system that was not previously possible, enabling a new level of granular analysis of design data used to prepare chip designs for manufacturing with new types of digests, including canonical cell digests and canonical design unit digests."  *Id.* at ¶ 22.  These inventive claimed processes allowed for automatic verification of whether the chip designs were the same, identification of changes in designs ranked by significance, automatic clearance of DRC violations, identification of royalty obligations, and performing other analyses not previously possible.  *Id.* at ¶¶ 20-22; '545 Patent at 6:57-71:50.

## IV.    ARGUMENT

The Asserted Claims are patent eligible because they are directed to concrete, non-abstract solutions to real-world problems, recite specific limitations, do not preempt the field, are directed to a technical application that is uniquely rooted in computer technology, and cover

inventive concepts providing tangible benefits.  Each of the Asserted Claims identifies a concrete solution to problems in the chip design and verification process.  In doing so, the Asserted Claims are directed to specific implementations of the solutions reducing intricate geometric design layouts into unique canonical forms where they can be efficiently digested and then stored and analyzed against known design layouts to optimize yield, efficiency, and profitability.

The Asserted Claims are presumed to be valid and patent eligible.  When determining the adequacy of Oasis' Complaint under Rule 12(b)(6), the Court is limited to facts stated in the complaint, which are deemed true.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).  Siemens bears the burden of establishing that each Asserted Claim is directed to ineligible subject matter by "clear and convincing evidence."  35 U.S.C. § 282(a); *CLS Bank Int'l v. Alice Corp. Pty. Ltd.,* 717 F.3d 1269, 1304-05 (Fed. Cir. 2013).  Siemens fails to meet this burden.

### A.    The Asserted Claims Are Not Abstract Under *Alice* Step One

#### 1.    The Asserted Claims Provide a Specific Solution

The first step under *Alice* in assessing the patent eligibility of the Asserted Claims is to determine if they are directed toward patentable subject matter, which is broadly defined, but excludes "abstract" ideas.  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014).

Siemen's attack on the Asserted Claims makes the fundamental error of cutting away all of the context from the claims, ignoring the specific problem they solve and their specific solutions, in an effort to limit them to what it argues is an abstract idea.  That is not the correct inquiry under § 101.  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016) ("describing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule") (citations omitted); *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018) ("Although there is difficulty inherent in delineating the contours of an abstract idea, we must be

mindful that all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.") (internal quotations and citations omitted).  Accordingly, Siemen's Motion should be denied because it is based on an overgeneralized caricature of the Asserted Claims as simply comparing data.

The Asserted Claims are patent eligible because they go far beyond simply comparing data, as Siemens incorrectly contends.  The Asserted Claims use variations of a specific process, discussed in Section III.B, involving partitioning and parsing designs using specific data structures, converting the designs into canonical forms that wash out non-functional differences between cells, and generating a digest for each cell that is compact and easily analyzed but corresponds to the canonical form for a cell.  D.I. 1 at ¶ 19; '545 Patent at 6:6-60.  This is a specific and novel way to verify and analyze cell designs that was better than conventional tools. The Asserted Claims are, therefore, patentable because they present specific solutions to a specific problem and improve the functionality of the computers used in the chip-design process.

The Federal Circuit's holding in *Enfish* is particularly instructive.  In that case, the court found patentable claims "directed to an innovative logical model for a computer database," improving the traditional relational database model with a logical database model.  *Enfish*, 822 F.3d at 1336-37.  This was a new and improved way to approach the challenge of organizing and processing computer data.  The Federal Circuit rejected the argument, echoed by Siemens here, that the claims in *Enfish* were abstract because they were generally directed to organizing data, "the concept of organizing information using tabular formats," or "storing, organizing, and retrieving memory in a logical table."  *Id.* at 1336-37.  These claims were patent eligible because they covered a ***specific way*** of organizing data, not just the ***broad idea*** of organizing data.  *Id.*

The Federal Circuit found that the *Enfish* defendant had "oversimplified" the specificity

10

of the claims and "downplayed the inventions benefits," just as Siemens does here. *Id.* at 1337-38. Like in *Enfish*, the Asserted Claims are "directed to a specific improvement to the way computers operate" by providing a specific and better way to validate and analyze chip designs, yielding multiple improvements to the chip-design process including permitting automation and providing increased efficiency, reliability, speed, and cost savings. *See id.* at 1335-36.

Indeed, the Federal Circuit has repeatedly confirmed that inventions, such as the Asserted Claims, are patent eligible if they provide a specific solution to improve computer technology, just as the Asserted Claims improve the computer functionality for verifying and analyzing chip designs. *See, e.g.*, *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1304 (Fed. Cir. 2018) (finding patent eligible invention that used a new approach to identifying viruses because provided a specific solution for improving computer technology); *Core Wireless*, 880 F.3d at 1363 (finding patent eligible claims that provided a specific solution for increasing the efficiency of computer display interface by provided a more compact summary and presentation of information and navigation options"); *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1150 (Fed. Cir. 2019) (finding patentable claims for a specific implementation for generating check data that improves on conventional systems' ability to detect systematic errors). The same applies to the Asserted Claims' specific solution for solving chip-design problems.

Following the Federal Circuit's guidance, judges in this District have found similar computer technology claims to be non-abstract because they are directed to a specific solution, rather than a problem, as is the case here where the Asserted Claims cover specific ways to verify and analyze chip designs rather than just the general idea of analyzing chip designs. *See, e.g.*, *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 179 F.Supp.3d 339, 353-54 (D. Del. 2016), *aff'd in relevant part*, 930 F.3d 1295 (Fed. Cir. 2019) (finding claims non-abstract and "necessarily

rooted in computer technology in order to overcome a problem specifically arising in the realm

of computer networks.") (quoting *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257

(Fed. Cir. 2014)).  For example, in *Network Congestion Sols., LLC v. U.S. Cellular Corp.,* 170 F.

Supp. 3d 695, 704-05 (D. Del. 2016), the Court found patentable a method claim that monitored

and controlled data flow rate in response to congestion indications.  *Id.*  The Court did so

because the claim overcame a problem specifically arising in computer networks, which is

similar to the Asserted Claims' solutions for verification and analysis problems specifically

arising in the chip-design process.  *Id.*

Siemens' reliance on *Electric Power Group* is unavailing.  In that case, the Federal

Circuit found that claims were not patent eligible because they only applied generic and abstract

concepts of gathering and analyzing information without providing any "inventive technology

for performing those functions."  *Elec. Power Grp., LLC, v. Alstom S.A.,* 830 F.3d 1350, 1353-54

(Fed. Cir. 2016).  In that case, the identification of specific **content** to be analyzed did not make

up for the lack of a specific **method** for analyzing the data.  *Id.*  In contrast, the Asserted Claims

cover specific inventive methods for performing validation and analysis functions.  Section III.B.

The laundry list of additional cases Siemens cites are similarly inapposite because they

dealt with claims that broadly covered basic concepts such as parsing data or comparing data,

without providing any meaningful limitations on how to do so.  *See, e.g.*, Motion at 7-8 (citing

*Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co*., 916 F.3d 1363, 1368 (Fed. Cir. 2019)

("Neither the '251 patent, nor its claims, explains **how** the drivers do the conversion that UFRF

points to."); *In re BRCA1- & BRCA2-Based Hereditary Cancer Test Pat. Litig.,* 774 F.3d 755,

763–64 (Fed. Cir. 2014) (finding the "breadth . . . the comparison step covers" was so broad that

it was not limited to any specific use)).

In sum, the Asserted Claims are not abstract and are directed to patentable subject matter because they provide specific tangible solutions that improve computer technology to address specific problems arising in the chip design and verification process.  *Enfish*, 822 F.3d at 1336-37.  Thus, Siemens' Motion should be denied.

> **2.    The Asserted Claims Solve a Problem Specifically Arising in the Computer Realm to Improve the Functionality of Chip-Design Computers**

The Asserted Claims are further not abstract because "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm" of computers.  *DDR Holdings.*, 773 F.3d at 1257.  As discussed in Section III.A, at the time of the Asserted Claims' invention, conventional chip-design technology was ineffective at verifying and analyzing the significance of changes in chip designs created with different tools, in different languages, or expressing the same functional design in different ways.

The inventions of the Asserted Claims are specific to and require computers.  They cannot be carried out in a human brain, which is incapable of converting chip designs into canonical forms, generating digests of the canonical forms, determining the significance of those canonical forms, and then analyzing such digests to identify matching portions.  These are problems that are unsolvable by the human mind and previously could not be done by computers. '545 Patent at 74:10-12 (the "parsers are optimized for automated digest generation, not for human use").  These claims are patentable because "[t]he computer here is employed to perform a ***distinct process*** to ***automate*** a task previously performed by humans," to the extent it could even be done at all.  *McRo, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (finding patentable claims for a new process for automatically animating lip movements to match speech, which improved conventional manual animation techniques).  "It is the incorporation of the claimed [process], not the use of the computer, that 'improved [the]

13

existing technological progress' by allowing the automation of further tasks." *Id.*, citing *Alice*, 134 S. Ct. at 2358.[2]

The Asserted Claims provide a technological solution to the chip verification and analysis problem by permitting meaningful and automated analysis between such chip designs using a specific new process. *See* Section III.C. Thus, the Asserted Claims are patent eligible because they are directed to an "improvement in the functionality of an existing technological process and not simply an abstract idea of manipulating data." *Koninklijke*, 942 F.3d at 1146; *see also Finjan*, 879 F.3d at 1304 ("The question, then, is whether [the claim] constitutes an improvement in computer functionality.").

As Siemens concedes, computers using the inventions of the Asserted Claims are better at performing chip-design analysis functions than conventional computers. Motion at 10. The Asserted Claims' ability to effectively analyze chip designs no matter how they are expressed improved the ability of chip-design computers to review updated cell designs, identify unapproved or bad cell designs, identify renamed cells in designs, detect modifications, conduct royalty audits, perform enhanced failure analysis, and many other important functions. '545 Patent at 68:57-71:50. As discussed in Section III.C above, these benefits flow from the specific concepts of the Asserted Claims, and were not possible with conventional technology.

## B. The Asserted Claims Contain Inventive Concepts Under *Alice* Step Two

Step Two of the *Alice* analysis is an independent basis upon which to find that the Asserted Claims are patent eligible. *CosmoKey Sols. GmbH v. Duo Sec. LLC*, 15 F.4th 1091,

---

[2] The fact that the claims of Asserted Patents specifically call out the use of computers to perform new, unconventional functions, renders Siemens' reliance upon *Synopsys, Inc. v. Mentor Graphics Corp.* inapt as the claims in that case "d[id] not involve the use of a computer in any way." Motion at 7 (citing *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1150 (Fed. Cir. 2016)); '545 Patent at Claim 1 ("a computer-implemented method" . . . "using a computer").

1097 (Fed. Cir. 2021) (*Alice* Step One need not be addressed if the claims satisfy *Alice* Step

Two).  The Asserted Claims are patent eligible under Step Two because they include inventive

concepts sufficient to render them patent-eligible even if they were directed to an abstract idea

(which is not the case).  *Alice*, 134 S.Ct. at 2357-58.  Thus, the patent eligibility of the Asserted

Claims is further confirmed when "consider[ing] the elements of each claim both individually

and 'as an ordered combination.'" *Enfish,* 822 F.3d at 1334, 1339 (citation omitted).

### 1.      The Asserted Claims Are Based on Inventive Concepts

The Asserted Claims are patent eligible under *Alice* Step Two because they include

inventive concepts (providing the benefits discussed above).  *DDR Holdings*, 773 F.3d at 1259.

The techniques of the Asserted Claims are not conventional and not routine, which renders them

patent eligible.  *See* Section III.A.  At the very least, the claim elements contain "an inventive

concept . . . in the non-conventional and non-generic arrangement" of the elements.  *Bascom*

*Global Internet Servs., Inc., v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).

Here, the conventional approaches to comparing chip designs relied on the designs being

expressed in the same language, and did not include use of inventive concepts including

canonical forms that "reduce sensitivity of data analysis to non-functional variations in the

design data within a particular cell," partitioning of the designs into significant and non-

significant parts, digesting canonical forms to permit meaningful and efficient analysis of the

chip designs, and providing functional reports based on the analysis which were not previously

possible.  '545 Patent at Claim 1.  Thus, the Asserted Claims are directed to a "new and

improved technique, for producing a tangible and useful result" and, thus, "fall[] squarely outside

those categories of inventions that are 'directed to' patent-ineligible concepts."  *Rapid Litig.*

*Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050 (Fed. Cir. 2016) (finding patentable claims

with inventive concepts that improved on conventional approaches).

### 2. The Asserted Claims Provide Tangible Benefits

The Asserted Claims are further patent eligible at *Alice* Step Two because they provide tangible benefits that flow from their inventive concepts in reliability, efficiency, and cost savings, discussed above in Section III(C). *McRo*, 837 F.3d at 1316 (finding patentable a software-based process that provided a "technological improvement" over conventional animation techniques); *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1304 (Fed. Cir. 2016) (finding inventive concept where a claim required generic components to operate in an unconventional manner to achieve an improvement in computer functionality). Thus, the important benefits provided by the Asserted Claims further confirm their patentability.

### 3. The Asserted Claims Recite Concrete Limitations and Do Not Preempt the Field

The Asserted Claims are further patentable under Step Two because they do not broadly cover the general idea of comparing chip designs. Instead, the Asserted Claims cover specific solutions for the specific problems created by the use of different tools, languages, and ways of expressing the same functional designs. In particular, the Asserted Claims variously require the use of different parsing techniques to generate canonical forms. The techniques include, for example, "parsing syntax of and normalizing the design data within the cells into canonical forms," "partitioning functionally significant design data from non-significant data," "parsing syntax of design data residing in first and second files, including header data and/or cell data," "a parser that parses a file containing design data representing aspects of a design for a physical circuit and creates . . . syntax trees," and creating "syntax trees in memory." *See, e.g.*, '545 Patent at Claims 1, 4-6, 8-11, 14-16; '571 Patent at Claims 1 and 16.

Further, the Asserted Claims then also require different techniques to generate digests of the canonical forms, such as "digesting to create at least one digest per selected partition,"

digesting to produce "at least one digest per cell . . . include[ing] at least the functionally significant design data," and "calculating and storing digests of at least functionally significant data in multiple layers of the canonical forms of the cells in the design file." '545 Patent at Claims 1, 4-6, 8-11, 14; '571 Patent at Claims 1, 3, 10, 12 15-16.  The digests can then readily be analyzed to generate reports of similarities and differences in chip designs, even when those designs are differently expressed.  These analyses are then variously used to identify "potentially modified cells," identify cells that match "digests of cells in . . . royalty-bearing libraries," or detect meaningful changes between libraries of cell designs. '545 Patent at Claims 2-3, 7, 9, 10, 18, 19; '571 Patent at Claims 5, 10, 11, 20.  Thus, the Asserted Claims recite a series of specific solutions, defined by concrete limitations, and do not preempt the field of chip analysis.

These specific limitations render the Asserted Claims patent eligible under *Alice* Step Two, for the same reasons Judge Andrews found claims eligible in *Art+COM Innovationpool GmbH, v. Google Inc*., 183 F.Supp.3d 552, 560 (D. Del. 2016).  In that case, Judge Andrews found claims directed to providing depictions of data to be abstract at *Alice* Step One.  However, he found the claims patentable at Step Two because they included specific limitations that provided inventive improvements over conventional technology:

> This amounts to "more than a drafting effort designed to monopolize the [abstract idea itself]." . . . There is not, for example, a bare recitation of "receiv[ing] and send[ing] . . . information over a network." . . . The elements of the method described in the '550 patent are not merely what a computer does; ***they are a specific procedure that is done by a computer***. . . . Claim 1 recites a specific way of overcoming a problem which plagued prior art systems. This specific solution, like that found in *DDR Holdings*, demonstrates a sufficient inventive concept.

*Id.* (citations omitted); *Smartflash LLC v. Apple Inc.*, No. 6:13cv447, 2015 WL 661174, at *8-9 (E.D. Tex. Feb. 13, 2015) (claims related to data storage are patent eligible, even though they were abstract, because "the asserted claims here recite specific ways of using distinct memories,

17

data types, and use rules that amount to significantly more than the underlying abstract idea.").

Because the Asserted Claims are limited to these specific techniques, they do not give rise to preemption concerns, the main reason for patent eligibility, and leave available unclaimed alternatives in the same field. *DDR Holdings*, 773 F.3d at 1259; *StoneEagle Servs., Inc. v. Pay-Plus Sols., Inc.*, 113 F.Supp.3d 1241, 1251-52 (M.D. Fla. 2015) (computer implemented payment claims patent eligible and not abstract because they did not pre-empt a "fundamental economic practice," and there are a "myriad of methods of transmitting a payment . . . that do not require the steps of [the] asserted claims.") (citation and internal quotations omitted). Therefore, to the extent the Court finds it necessary to assess Alice Step Two, the aforementioned meaningful limitations are dispositive of this step, and dictate denial of Siemens' Motion.

Finally, because the Asserted Claims vary substantially in the limitations on how the chip designs are processed, parsed, partitioned, digested, and analyzed, for example as shown in the different limitations discussed above in this Section, there is no merit to Siemens' contention that Claim 1 of the '545 Patent is representative of all of the Asserted Claims. Each of the Asserted Claims should be separately assessed for purposes of patent eligibility, in view of the specific combination of elements recited by that claim.

### C. *Berkheimer* Confirms That Siemens' Motion Should Be Denied Because it is Based on Factual Disputes That Cannot Be Resolved on the Pleadings

Siemens relies heavily on the Federal Circuit's decision in *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368-70 (Fed. Cir. 2018), but that case confirms that this Motion should be denied. *See* Motion at 1, 15-19. The overarching premise of *Berkheimer* is that "whether a claim element or combination of elements would have been well-understood, routine, and conventional to a skilled artisan in the relevant field at a particular point in time is a question of fact." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 890 F.3d 1354, 1355 (Fed. Cir. 2018).

As cited above, the Asserted Patents and the Complaint are replete with factual statements regarding the benefits of the Asserted Claims and how the Asserted Claims are directed to an unconventional approach to solving the real-world problem of validating and analyzing computer chip designs. *See, e.g.*, D.I. 1 at ¶¶ 17-18 (describing how the claimed inventions enable the detection of cells that are functionally the same, even if they are differently described in design files); '545 Patent at Claim 4 (describing how to detect differences in cells expressed in OASIS® and GDSII design languages); '571 Patent at Claims 4 and 16 (describing how to find differences in designs based on different languages). Thus, the Asserted Patents and Oasis' Complaint lay out numerous facts about the benefits, advantages, unconventionality, and inventiveness of the Asserted Patents which this Court must take as true in the context of a motion to dismiss. *Aatrix Software, Inc. v. Green Shade Software, Inc.*, 882 F.3d 1121, 1126-28 (Fed. Cir. 2018) (where a complaint "raise[s] factual disputes underlying the § 101 analysis," the complaint should not be dismissed at the pleading stage); *see also Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1320 (Fed. Cir. 2019) (vacating Rule 12(b)(6) and Rule 12(c) dismissals where complaint made plausible and "well-pleaded allegations" of eligibility).

Siemens' disputes with Oasis regarding the inventive nature of the claims and the shortcomings of conventional technology are factual disputes that cannot be resolved in Siemens' favor at the pleadings stage. Instead, these factual disputes should be addressed in discovery and expert reports. *Berkheimer*, 881 F.3d at 1368-70 (vacating summary judgment of patent ineligibility "given the fact questions created by the specification's disclosure").

For this reason, Siemens invites error in asking the Court to find the inventions of the Asserted Claims to be conventional at this stage of the case. In *BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016), the Federal Circuit vacated a

dismissal under Rule 12(b)(6).  The district court had found that the asserted patent was directed to ineligible subject matter because it was based on allegedly conventional use of Internet filtering structures.  *Id.* at 1345-47.  The Federal Circuit noted that "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces."  *Id.* at 1350.  The Federal Circuit then found that placing the conventional filtering tool at "a specific location," could rise to an "inventive concept" and vacated the dismissal because under the "limited record, this specific method of filtering Internet content cannot be said, as a matter of law, to have been conventional or generic."  *Id*.  So to here, it would be error to conclude on the pleadings that the Asserted Claims are limited to conventional or generic practices.

Finally, Siemens brushes aside the fact that the Federal Circuit vacated summary judgment as to claims 4-7 in *Berkheimer*.  Those claims recited "storing a reconciled object structure in the archive without substantial redundancy," and the specification of that patent explained that doing so improves systems' operating efficiency, reduces storage costs, and was not a conventional approach.  881 F.3d at 1370.  The specification further explained that "conventional digital asset management systems cannot perform one-to-many editing because they store documents with numerous instances of redundant elements."  *Id.*  These facts are very similar to the Asserted Claims, which cover specific ways to process chip designs that improve efficiency, reduce costs, were not conventional, and permit the performance of new functions. *See* Section III.C.  These statements created "a genuine issue of material fact making summary judgment inappropriate."  *Berkheimer*, 881 F.3d at 1370.  Thus, *Berkheimer* precludes resolution of this dispute on the pleadings.  *Id.*

V.   **CONCLUSION**

For the reasons set forth above, Siemens' Motion to Dismiss should be denied.

OF COUNSEL:

POTTER ANDERSON & CORROON LLP

Paul J. Andre
Lisa Kobialka
James Hannah
KRAMER LEVIN NAFTALIS
& FRANKEL LLP
990 Marsh Road
Menlo Park, CA 94025
(650) 752-1700

Aaron M. Frankel
Cristina Martinez
KRAMER LEVIN NAFTALIS
& FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

By: */s/ Philip A. Rovner*
Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
Hercules Plaza
P.O. Box 951
Wilmington, DE  19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Plaintiff
Oasis, Inc.*

Dated: April 18, 2022
10112205